Good morning, Your Honors. Deborah Drew, Stirkham, Stirkham-Mulvane, for the appellant. I'm here today on an appeal from the grounds of an anti-SLAPP motion in the defamation case. And in the briefs, we covered the law fairly thoroughly. What I'd like to do today in the brief time I have is to give an overview of the two major errors, we believe, in reasoning that led to the Court's order. The first of these errors is that the lower court weighed the evidence. And by weighing the evidence, I don't just mean taking defendant's evidence and assessing its weight and comparing it to plaintiff's evidence, which, of course, is improper under the SLAPP statute. I also mean making credibility determinations and making and ignoring vast amounts of evidence that plaintiff had, particularly in support of its constitutional malice argument, but also in support of its defamatory meaning argument. Doesn't the judge have a duty to determine whether the plaintiff has a probability of success? Absolutely. How would you propose he do that? Well, Your Honor, under the anti-SLAPP statute, a court's role is different than the role of a trial court. I mean, it's different than the role of a court at trial. What the court has to do is determine whether the plaintiff has presented enough evidence to constitute a prima facie case. And a prima facie case is enough evidence so that a trier of fact may find in the plaintiff's case. So your argument is essentially a summary judgment standard. Is that what you're arguing? Not quite, because you know. Well, then, if it's not a summary judgment, then he does have to weigh the evidence. It's a summary judgment standard insofar as all of the evidence that plaintiff submits, to the extent that it's admissible, is deemed true, and the court may not balance against that evidence, the defendant's evidence, unless it defeats plaintiff's confidence as a matter of law. So it's a summary judgment standard. Effectively. And is that California law? First of all, do we follow California law on that issue, or Federal law, as to how you do this SLAPP thing? To the extent that Rule 56 is consistent with the anti-SLAPP statute, follow the anti-SLAPP statute, where there are differences. All right. So under California law, at this stage, does the judge do nothing but find out whether if he believed the plaintiff's evidence, they could prevail, or do they in some way weigh the evidence? In no way do they weigh the evidence. It's improper to weigh the evidence, precisely because that would usurp the role of the jury. The judge isn't sitting as a weigher of credibility or a weigher of evidence here. He's just finding, based on what the plaintiff presents, whether there's sufficient evidence to prevail. And in this case, we established defamatory meaning, which the Court vacillated on, by a great deal of evidence. Nevertheless, the record reveals that the Court weighed defendant's evidence against plaintiff's evidence. But more importantly, we put on a great deal of constitutional malice evidence that the Court didn't even consider. We demonstrated the very heart of constitutional malice, that the defendants expressed doubt as to the truth of the statement that lies at the core of the defamation motion, to wit, that the plaintiff's evidence was not sufficient. And that's what we're trying to do here. We have a language translation problem and a cultural translation problem. And the doubts that were expressed had to do with how to express, A, in terms of a different culture and language, B, not really about truth, but about is this equivalent to that? Fairly or not, you know, is it fair to say that this is like that? Your Honor, the best way to answer that question is to say, regardless of whether the Japanese term means miscellaneous school or means vocational school or means trade school, the fact remains it means something other than what the plaintiff in this action, than what SUA is. SUA was a fully-fledged, fully-authorized, four-year university. It had state of the art law. What do you mean it was fully-fledged? Did it have the accreditation from the Western Association at that time?  Full accreditation from the American Academy of Liberal Education? What the university had. So I know what it had, but I know also what it didn't have is what I'm asking you. Yes, but what was said in the article is that it didn't have nin-ka. Nin-ka in Japanese is license, permission to operate as a university, permission to call itself a university, permission to issue four-year degrees. In this state, nin-ka, a license to operate, comes from the California Bureau of Secondary  Well, that's Judge Berzon's question. Nin-ka is not necessarily an American concept. You have different accrediting institutions in Japan. You have an institutional accrediting body in Japan that is operated by the government. And here in the United States, you had three different institutions, one of which was a that had not yet given the university accreditation. There's no question about that, Your Honor. The question is, did the university... When you answered Judge Silverman's question, you kept using the word, you know, fully displayed that. But the one phrase that you didn't use was you didn't say they were fully accredited because they are not fully accredited in the way that we would use that term. They had license to operate. The phrase kakushikako, without nin-ka. In California, for the bar, for example, there are three categories of law schools. And we do look at them differently. There are law schools that are fully accredited. There are ones that are California accredited, and there are ones that are unaccredited. Now, I assume that all of them are approved by the state licensing agency to operate. I mean, I don't even the unaccredited ones are not, I'm assuming, I don't know this, have the lowest, the BM, BP, whatever it is, license. Absolutely. And it would be un... And we call them unaccredited. And it would be un... It would be defamatory to say of those law schools, even those on the lowest rung, that they are operating without permission from the State of California. But not that they're unaccredited and less reliable. I'm talking about the difference between a license to operate and the good housekeeping seal of approval. Of course you can say these lower-level law schools don't have the good housekeeping seal of approval because they don't have these other accreditations. But what they do have is permission from the government to open their doors as a law school and issue JD degrees. And the article said that. No, it didn't. The article said that they referred to it as a university and they're operating as a university? On the contrary. It didn't call it a university in the article? On the contrary. Every single time. I keep asking you a question, you answer a different question. No, I... It referred to it as a university, didn't it? I'm trying to answer your question. Okay. Well, that's the question. Does the article... No, I answer no question. It's a question that needs to be answered like this if you give me a chance. Well, you can answer whatever you like. Every time the article used the word university, it used it to underscore the theme of the article. Although it calls itself a university, it's really this. Although it looks like a university, it's really this. Every time the word daigaku, which is the Japanese word for university, was used in the article, it was used to convey the message, SUA is not what it claims to be. And a similar article about an unaccredited law school in California and said, this thing says it's a law school, but in fact, its graduates don't pass the bar very much and, you know, they don't teach very much and so on. I mean, the fact is that I gather in Japan, it's not illegal to operate without approval. Yes, it is. It is. That's precisely the point. In Japan, and the defendants said this repeatedly in their depositions, and our evidence proved it, but they admitted it. In Japan, kakushugaku is by law not a university authorized to operate by the government. By law. It's in the Japanese education law. And they made a big point of this. And defendants admitted that Japanese readers understand kakushugaku to mean that it can't call itself a university. That's the point. A university must have the Japanese Ministry of Education. Is that a name problem? It can't call itself a university. It could call itself college or school, but not university. Is that the problem? It can't call itself university, although there are some instances where American universities have gone over there and retained the title. But technically, it cannot call itself a university. It cannot issue degrees. It cannot – its graduates don't have the prestige of a graduate from a university. That is true of an unaccredited university. You can get a degree in three months. It's not a four-year institution. But it is true in this country of unaccredited universities, even ones like this one, which are start-ups, essentially, and they become accredited, that people say, well, I don't know what to make of this degree. I'm not sure I want to go to this school until it's accredited, because I don't really know. Having a degree from an unaccredited university is not as prestigious. It is not. So it's not a misrepresentation. It's a misrepresentation to say that they didn't have the authorization to issue degrees and to act as a university and to call themselves a university. And what the article says is, although – although – SUA calls itself a university, it is, in reality, something else. And that's the message of the whole article. It's not something else, Your Honor. It's a university that is accredited now. At the time of publication, it was authorized to operate by the State of California. And to say it was something other than it purported to be, to say that it was holding itself out is one thing. And actually, another thing, operating under false pretenses, is defamatory. And I just want to say that. Your time is up. Thank you, Ms. Drewes. We'll now hear from the appellee. Good morning, Your Honors. It's Timothy Alger from Quinn Emanuel on behalf of the appellees. May it please the Court. The question presented in this case is, did the weekly post knowingly mischaracterize Sophie University of America? And the answer is no. The district court properly found that there was no false statement. Viewed in context, Kakashiwaka was not a false characterization of the school, given the description of the school throughout the article. And I don't need to go through all that. I think that's spelled out in the papers. Necessarily, then, since there wasn't a false statement, then there could not be actual malice. There couldn't be a knowingly false or probably false statement. If the defendants didn't understand. But it is, it is, if you look at the English translation, I mean, it is pretty clear that SUA would not be regarded as a vocational school in this country. I understand we have a cultural, we have a cultural problem and a language problem, two different problems that Judge Berzon pointed out. But it has, and I'm just working out the English translation because my Japanese isn't very good. It's non-existent, so I was just going to say it's not very good. But it is not true that it is regarded as a vocational institution. That is not a true statement. The plaintiffs presented a couple of simplified dictionaries that used the word vocational school. Simplified dictionaries are just for tourists. Some of which were published by your client. Right. But this case can't be judged by an English translation. What has to be done is the court and the jury, if there was a jury trial, has to decide what would the reasonable reader of the article understand to be conveyed here. And what the, what an English translation is, isn't relevant for that. It's what people in Japan, Japanese, that are reading in Japanese, understand to be conveyed here. And the better standard is not a simplified English dictionary, but what does the, what does the statute, the Japanese statute say? What does it describe Kakashi Gakko as? One thing that your clients might have done here, in all of their back and forth about how, about what to do with this, would have been to have explained the difference between the U.S. accrediting system and the Japanese accrediting system. But you didn't do that. You sort of seemed to force it into the Japanese system. It's a bit of a shortcut. It's pretty clear that in this article they were taking, they were taking all the slaps at the university that they could. Your Honor, with all due respect, of course, the courts are not in a position to double-check editing. There's a reasonable editing, reasonable word choice that could be taken. And what we have here is we have the defendants making a reasonable choice of a word. And as we've, as has been shown, the other side has not come forward with a counter description of the school. They've never contended that we should have called it a daigaku. Never. Because it's not a daigaku. Under the Japanese standards, it's not a daigaku. It's not an Article I institution in Japan. So we had to come up with something else. And we made a reasonable choice, given the circumstances, to call it a shugaku. But we also went ahead and described it for 62 paragraphs, what this school was all about. Now, some of which the other side doesn't like, but the fact is we described the school. They didn't sue over much of it, of course, which in their reply the plaintiff goes off about the security cameras and so on and so forth. They didn't sue over that because it's true. And so what we're doing is we're focusing on our choice of word, kakushugaku, which was reasonable under the circumstances. And the court, the district court in that situation, must – it's almost like an implication case. In an implication case, the court has to determine, one, what was conveyed to the readers. Was it reasonable? What the plaintiff is alleging, was it reasonably conveyed to readers? That's the first step. The second step is, did the defendants intend to convey that meaning to readers? So here, in a translation situation, we have a similar situation. And Judge Selma properly evaluated what was being conveyed to the readers. And he determined that we didn't convey anything that was false to a Japanese reader. And therefore, since we didn't convey anything that was false, then we couldn't have intended or knowingly conveyed something that was false. Then we didn't meet the actual malice inquiry. What about the conceptual question of what standard is being applied here? I mean, they did put on some evidence that this means vocational school. And did they put on any evidence that a Japanese person would regard this as something that's just teaching people trades? I don't know exactly what the evidence is in that regard. But how do we deal with the question of weighing evidence or not weighing evidence? Well, the standard here, I think I agree it's a motion for summary judgment type standard. They have to come forward with evidence that would be admissible at trial that would support a judgment. So what's necessary to support a judgment? Clear and convincing evidence of actual malice. And we presented, we showed the court, Judge Selma was correct in determining that a jury would not be able to render a verdict that would be sustained on appeal under the clear and convincing standard of actual malice. That we knowingly, that the defendants knowingly put out to the readers of the magazine that we were, that this was a vocational school. Now, for that purpose, for example, the, even if they have experts saying that this means vocational school, they would also have to demonstrate that you knew that you didn't choose this word the way you're describing, i.e., because from the choice of possibilities, it was the closest in thing there was, et cetera. That's right. Because, see, I don't think experts have a place in this. So if this was in an English language publication, we wouldn't allow experts to be involved at all. But to the extent experts can be involved, I suppose they could say a cacosugaco means vocational school. But then the next step is the plaintiffs have to establish by clear and convincing evidence that we understood that to be the meaning of cacosugaco, and that we intended to convey that to the readers. And they have no evidence like that. As Your Honor pointed out, there may have been some concern about whether they were using the right term, but it was a translation issue. We have, and I think we have to look to the Bowes case where the Supreme Court talks about this, and it's adoption of language, the adoption of language chosen was one of a number of possible rational interpretations of an event that bristled with ambiguities and descriptive challenges for the writer. And in this situation, the Supreme Court went on to say simply because an intelligent speaker would have to know that the term was inaccurate in context, even though he did not realize his folly at the time, that doesn't create actual malice. And in the Bowes case, the question was whether the reviewer of the speakers understood that he was making a false statement at the time about whether the sound was moving around the room or not. And the court said, well, he may have mischosen his words, and in retrospect, that was probably a mistake. But the fact of the matter is, at that time, he understood that he was conveying he was trying to accurately describe the speakers. And so here it is. Ginsburg. And that case has always just mystified me, that we could make a libel case out of that. Kagan. Right. But I think that here where we're translating, as the courts, Your Honors have recognized, we're translating something that does not directly analogous of the United States accreditation system to Japanese readers. The editors and reporter tried to make their best judgment. And I think, if anything, the record shows that they were endeavoring to make their best judgment. And they did, and they made that choice. And we can't sit, the court can't sit and second-guess that, because then we're essentially applying a negligence standard. And we're saying, well, they could have done better. They could have looked at an extra dictionary. They could have asked another person. That's a negligence standard, and that's improper. What we have to do is we have to determine, is there evidence here, clear and convincing evidence, that the defendants knew that they were conveying to readers something that was false. And I think the plaintiffs have failed to meet that standard. With that, I'll submit, Your Honors. Thank you. Ms. Drewes, you used up your time. If you'd like to take one minute, we'll give you a minute. If you keep it to that, please. Thank you very much, Your Honors. First of all, in response to the last comment, we, the plaintiffs below, submitted a ton of evidence that the defendants knew that SUA was not, Cox-Chicago was not a school that didn't have government authorization. But let's get away from the Cox-Chicago issue for a minute. We also claimed that the university was defamed because there was inflation, a gross inflation of the dropout rate at the school. The ---- I don't know where that was going to get you, Counsel. They took a number that was off of your website. No, Your Honor. Here's what they did. They knew from two people that they trusted, professors at the university, that the dropout rate was 20 percent. A hundred students, 80 would graduate. What they did is they took that 20 percent dropout rate and they calculated. They went to the website. They got the ---- Were they told by the professors that it was a 20 percent dropout rate? Correct. Or were they given a number, a number of graduates? They were told that there were 100 students in the class and 80 were expected to graduate. Okay, but they had to calculate the percentage themselves. And so it very much depends on what numbers you use. They were told that there were 80 graduates. They were told by the professors that there were 100 enrolled. Well, that's not what your website said. But obviously, if there are, if there's discrepancy between the website's class size and the professor's class size, the reasonable conclusion is that there is discrepancy between the number of graduates. I mean ---- There may be. It could have been puffing on the part of the professors. They might have simply been wrong. And this is something that ---- Again, it's clear to me that the newspaper cut everything against your client, that they could. But the bottom line is they took a denominator that came off of your website. I don't know how you can complain about that. They created a false ratio. And in the Crane v. Arizona Republic case, the Ninth Circuit said that the misleading juxtaposition of true facts to create an appearance, to create a perception that is false, is not only defamatory, but evidence of constitutional malice. And here they took facts that they, that were true in separation. They combined them in a misleading way, led to a misleading ratio. And they did that deliberately. In fact, it was Mr. Harai, who was the copy editor, testified that he calculated the 33%, the one-third ratio, because 80, because the difference between 80 and 120 is one-third. That's right. That's an intentional act. That's not an accident. That's not negligence. Your time is up. Thank you to both counsel. The case is submitted. The next two cases on the calendar, Rohrer and United States v. Lowe, are submitted at this time on the briefs.
judges: Silverman, Berzon, Bybee